UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PHALA POWELL                                    CIVIL ACTION

VERSUS                                          NUMBER: 07-5554

MICHAEL J. ASTRUE,                              SECTION: "I"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), presently before the Court are the parties' briefs following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 11, 15).

Phala Powell, plaintiff herein, filed the subject applications for DIB and SSI benefits on October 28, 2004, alleging disability

as of August 11, 2004.[1]/ In a Disability Report that appears in the record, plaintiff's disabling conditions were identified as cancer, tendonitis, and migraine headaches. (Tr. pp. 39-50). Plaintiff's applications for DIB and SSI benefits were denied by the Social Security Administration, following which she requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. pp. 21, 34). That hearing went forward on December 22, 2006 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 378-409). On February 21, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 10-20). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In the brief supporting her request for judicial review, plaintiff presents the following two issues:

    1.    [w]hether the Administrative Law Judge's residual functional capacity assessment is supported by

---

[1]/ The applications are not contained within the administrative record that was provided to the Court but neither party disputes the procedural history of the proceedings below.

2

substantial evidence.

2.    [w]hether the Administrative Law Judge's finding that
      claimant can return to past relevant work is supported by
      substantial evidence.

                                              (Rec. doc. 11, p. 1).

    Relevant to the issues to be decided by the Court are the
following findings made by the ALJ:

1.    [t]he claimant meets the insured status requirements of
      the Social Security Act through December 31, 2008.

2.    [t]he claimant has not engaged in substantial gainful
      activity since August 11, 2004, the alleged onset date
      (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and
      416.971 et seq.).

3.    [t]he claimant has the following severe impairments:
      Status Post Stage IIB Adenocarcinoma of the Endometrium;
      Status Post Pulmonary Embolism; and Osteoarthritis (20
      CFR 404.1520(c) and 416.920(c)).

4.    [t]he claimant does not have an impairment or combination
      of impairments that meets or medically equals one of the
      listed impairments in 20 CFR Part 404, Subpart P,
      Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
      416.920(d), 416.925 and 416.926).

5.    [a]fter careful consideration of the entire record, the
      undersigned finds that the claimant has the residual
      functional [capacity] to lift and carry 10 pounds
      frequently, 20 pounds occasionally; to stand and walk for
      six hours and to sit for six hours out of an eight hour
      day; to push and pull within the limits of lifting and
      carrying; to engage in a full range of postural movements
      frequently, with the exception of never climbing ropes,
      ladders or scaffolds; to manipulate, see and communicate
      without restriction and to work within any environment.

6.    [t]he claimant is capable of performing [her] past
      relevant work as a court reporter. This work does not
      require the performance of work-related activities

                                3

precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  [t]he claimant has not been under a disability, as defined in the Social Security Act, from August 11, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. pp. 15, 16, 17, 19, 20).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not

reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. <u>Harrell</u>, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled

6

at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

At the time of the administrative hearing that was held on December 22, 2006, plaintiff was fifty-four years of age, had completed high school as well as court-reporting training, and had past relevant work experience as a court reporter. Plaintiff's attorney started the hearing by arguing that the combination of plaintiff's impairments rendered her disabled. Those included a diagnosis of stage 2B endometrial cancer in February of 2004 resulting in a radical hysterectomy and catheter radiation which, in turn, caused neurological complications. A suspected recurrence in October of 2004 was eventually ruled out but plaintiff had also been treated for a possible fistula. As a consequence of her impairments, plaintiff experienced severe pain and had to take frequent bathroom breaks. In October of 2005, she also suffered a pulmonary embolism with resulting shortness of breath and had recently been diagnosed with rheumatoid arthritis. Counsel further argued that plaintiff's doctor had limited her to lifting ten pounds; that plaintiff had difficulties with sustained concentration, persistence, and social interaction; that she now had difficulty with hand manipulation; and, that her concentration was impaired secondary to pain. (Tr. pp. 382-383).

Plaintiff then took the stand and was questioned by the ALJ. She testified to first becoming unable to work in the summer of 2004, initially being told that she had only a 50% chance to live. Following her surgery in 2004, plaintiff underwent a course of radiation treatments and had a PET scan done in 2005 and possibly 2006. In terms of daily activities, plaintiff was capable of attending to her own personal hygiene needs and performing various household chores which she shared with her husband. However, plaintiff had recently begun to experience a significant increase in migraine headaches which had gone from a total of three in 2004 to three per week, with some headaches lasting for as long as twenty-four hours. When such episodes did occur, hygiene and household tasks would get put on hold. Plaintiff no longer pursued the hobbies she once had but still went to church weekly unless she was too ill to attend. She typically took a nap during the afternoon but several days per week she was simply unable to get out of bed, a situation that began in 2004 due to recurrent bladder infections and general malaise but was more recently the result of debilitating migraine headaches. (Tr. pp. 383-394).

At the time of the hearing, plaintiff's medications consisted of cortisone three times per day, Plaquenil twice per day, and Lortab every four to six hours which she had been taking since her surgery in 2004. She had also been prescribed Mepergan Fortis to

use as needed for migraine headaches.  Except for some weight gain, no side effects from the medications were reported.  Plaintiff also complained of vision problems which caused her to alternate between wearing glasses and contact lenses.  She was prone to having recurring urinary tract infections which would then increase the frequency of bathroom use.  Plaintiff estimated that once per week she would suffer from an episode of incontinence. (Tr. pp. 394-399).

Upon being tendered to her attorney for questioning, plaintiff testified to the medical history which precipitated her applying for Social Security benefits.  She was initially diagnosed with cancer in 2004 and was given a 50% chance of survival. Following surgery, she started a one-shot course of radiation therapy which had to be interrupted and restarted after she developed cystitis. Since completing radiation, plaintiff continued to experience fistula-related pelvic pain and pain with urination which would require several weeks of antibiotics to resolve.  In 2006, plaintiff had gone through two such courses of antibiotic treatments.  Plaintiff continued to suffer from flu-like symptoms as a result of her cancer and resulting treatment.  She also testified to having rheumatoid arthritis which was being treated with cortisone that had recently become less effective. Plaintiff's hands were becoming deformed and it was expected that

the disease would spread to her ankles, knees, and shoulders. When asked if she could perform her past work as a court reporter, plaintiff testified in the negative, citing decreased concentration, a decreased ability to use her hands, an inability to carry the equipment needed for the job, and the need for frequent bathroom breaks. The performance of any other work was also doubtful due to diminished concentration and fatigue from pain medication. (Tr. pp. 399-403).

Douglas Kuylen, a VE, was next to take the stand. He began by classifying plaintiff's past job as a court reporter as sedentary, skilled work. The ALJ then posed a lengthy hypothetical question to the VE, as follows:

> Q. Let me ask you to consider the following hypothetical. Let me ask you to assume an individual 51 years of age in 2004 onset date, currently 54 years of age. Assume a high school education, assume past work identical to that you just identified. Assume with respect to lifting, carrying, pushing, pulling, assume an individual limited to light and sedentary work only. Assume walking or standing two hours combined total out of an eight-hour day. Assume with that regular work breaks for this purpose. Assume sitting six hours of an eight-hour day, assume a regular work break, but I'll get to breaks here in just a moment, but assume some postural limitations: bending, stooping, kneeling, crouching, crawling only occasionally, ramps or stairs only occasionally and assume use of foot pedals only occasionally. Assume further

an individual unable to climb ropes, and ladders and scaffolds, unable to work in environments of unprotected heights, dangerous machinery parts, or environments that person's going to be exposed to extremes of temperature, meaning less than 50 or more than 90 degrees Fahrenheit. Assume an individual able to understand, remember and carry out simple through moderately detailed instructions only in a work-related setting, but assume distractibility secondary to pain or fatigue issues that's resulted in a situation the individual's unable to interact with the public more than occasionally, and I assume it's not going to make a difference whether that interaction would be in person or over a telephone. You can also assume some symptoms from a variety of sources, particularly the, the need for frequent breaks, be it bathroom breaks or other effects aside of medication. Assume that's resulted in breaks that would average out anywhere from ten to 15 minutes on an hourly basis throughout the course of a day. Lastly assume symptoms from a variety of sources, some of which I've already mentioned here, mild to moderate chronic pain or fatigue related symptoms. Assume all of these variously described, assume all of sufficient severity so it's been noticeable to that person all the time, she had (sic) able to remain attentive and responsive within the above limits that I've just given to you. As you know, I do tend to talk quickly. Let me back up and ask if you got all that.

(Tr. pp. 404-406).

In light of the numerous limitations set forth in the hypothetical question, the VE was asked whether the described

11

person could perform plaintiff's past work as a court reporter.
Kuylen answered that question in the negative, explaining that
court reporting was a skilled occupation requiring attention to
detailed instructions and that it was also a job in which breaks
could not be taken at will. When asked whether there was other
work available that the individual could perform, the VE again
replied in the negative, testifying that the numerous limitations,
particularly the break requirement, would simply render the
individual unable to maintain employment. The VE was then
tendered to plaintiff's counsel for additional questioning but she
declined. Thereafter, the ALJ added even further restrictions to
the hypo in the form of upper extremity limitations. Once again,
the VE testified that there was no work available that the
individual described in the hypothetical question could perform.
(Tr. pp. 403-409).

The medical evidence generated during the relevant time period
begins with a treatment note dated January 17, 2003 from the
Ochsner Slidell Clinic. At that time, plaintiff complained of
progressively worsening right upper extremity pain of the previous
three months. The assessment was lateral epicondylitis and
plaintiff was treated with an injection to the affected area. (Tr.
pp. 90-91). Plaintiff was next seen at the Miller Family Medicine
Clinic ("MFMC") on March 27, 2003 for an upper respiratory

infection and fatigue. (Tr. p. 88). Plaintiff was seen again at MFMC on April 22, 2003 for sinus trouble. (Tr. p. 87). Over the next several months, various prescriptions were issued by the Clinic including Amoxil, Keflex, and Omnicef. (Tr. pp. 86-87). On November 19, 2003, plaintiff returned to MFMC for prescription refills and for complaints of headaches. The assessment was migraine headaches and Lorcet and Phenergan were prescribed. (Tr. p. 85).

On January 9, 2004, plaintiff was seen by Dr. Ingrid Roskos for complaints of profuse vaginal bleeding of the previous six to seven months with occasional clotting the size of a tennis ball. Fatigue and bleeding occurred in between periods with some watery vaginal discharge from time to time. Migraine headaches were reported at a rate of six per year. An ultrasound performed on January 22, 2004 revealed an enlarged uterus and a thickened endometrius with a small amount of fluid present. An endometrial biopsy was also performed which revealed well-differentiated endometrioid adenocarcinoma and endocervical curettage. Dr. Raskos referred plaintiff to Dr. Patricia Braly and the two physicians discussed and planned a total abdominal hysterectomy with bilateral salpingo-oophorectomy, a possible radical hysterectomy, or a possible modified radical hysterectomy with staging. (Tr. pp. 94-95). Plaintiff met with Dr. Braly, a hematologist/oncologist, on

13

February 2, 2004. Following further testing, plaintiff was diagnosed with moderately differentiated endometrioid adenocarcinoma and an MRI was ordered, after which a more definitive surgical plan was to be developed. (Tr. pp. 223-228). Plaintiff received a pre-surgical consultation at MFMC on February 3, 2004 and was prescribed Xanax. (Tr. p. 84).

An MRI of the pelvis and abdomen, with and without contrast, was performed on February 5, 2004 at the Lakeview Regional Medical Center ("LRMC"). Those tests revealed an abnormal appearing uterus which was to be considered of ominous neoplastic significance and a few Tarlov cysts of the sacrum. In addition, multiple focal lesions were found on the liver with most of those probably being cysts except for one. (Tr. pp. 187-192). A chest x-ray done on February 6, 2004 revealed a questionable subtle left lower lobe nodule which was to be evaluated further via a CT scan. (Tr. pp. 144-145). On that same date, plaintiff met with Dr. Braly to discuss the recent test results. (Tr. pp. 221-222).

On February 10, 2004, plaintiff underwent a whole-body PET/CT scan with image fusion. That testing revealed a marked hypermetabolism within an enlarged uterus believed to be an endometrial carcinoma and a linear area of hyperintensity posterolaterally on the right side of the pelvis deserving of further study. (Tr. pp. 180-181). A CT-guided liver biopsy was

also conducted around this time which produced a less-than-optimal specimen but was otherwise essentially normal. (Tr. pp. 182-186).

Plaintiff was subsequently admitted to the Slidell Memorial Hospital ("SMH") where she underwent an exploratory laparotomy, a radical hysterectomy, bilateral salpingo-oophorectomy, and pelvic and periaortic lymph node dissection at the hands of Doctors Braly and Roskos. Following pathological study, well-differentiated (Grade 1) endometrioid adenocarcinoma was confirmed within the uterus but the excised lymph nodes were cancer-free. (Tr. pp. 96-106, 215-218). Plaintiff was discharged within days of her surgery. (Tr. p. 113). On February 18, 2004, she presented to the SMH Emergency Room with complaints of shortness of breath, an increased heart rate, and pain in the left thigh. Various tests were run and plaintiff was diagnosed with constipation and weakness of unknown etiology. (Tr. pp. 112-118). Plaintiff returned to the SMH Emergency Room on February 21, 2004 complaining of a headache and nausea. The diagnosis was a headache and plaintiff was administered an injection of Demerol and Vistaril. (Tr. pp. 107-110).

On February 26, 2004, plaintiff was seen at MFMC for symptoms of an upper respiratory infection. The diagnosis was bronchitis and various medications were dispensed. (Tr. p. 83). Plaintiff received a post-operative evaluation by Dr. Braly on February 27,

2004 and was said to be doing well except for some burning at an incision site. Radiation therapy was to be started. (Tr. pp. 213-214). On March 16, 2004, plaintiff received her radiation therapy initial consultation with Dr. Renee Levine of the Mary Bird Perkins Cancer Center. After consulting with Dr. Braly, Dr. Levine elected to obtain yet another opinion before making a final decision on radiation therapy. (Tr. pp. 140-142). Plaintiff was feeling well when she and her husband met with Dr. Braly on March 23, 2004 and a lengthy discussion was held regarding the pathological report and the risks and benefits of adjuvant therapy. (Tr. p. 212).

Plaintiff presented herself to the SMH Emergency Room on April 28, 2004 with complaints of bladder pain and frequent urination. She had apparently begun radiation therapy by this time and had received her most recent treatment three weeks earlier. A pelvic CT scan with contrast revealed some air within the bladder, probably iatrogenic in nature, mild thickening of the bladder wall, possibly related to mild radiation cystitis, and a suggestion of sigmoid diverticulitis. The diagnosis was abdominal pain. Medications were prescribed and plaintiff was to follow-up with Dr. Levine the following day. (Tr. pp. 119-129). Plaintiff was next seen by Dr. Braly on April 30, 2004. Complaints at the time included abdominal pain, bloating, burning in the bladder, frequent urination, and diarrhea. No treatment plan was set forth on the clinic note. (Tr.

p. 211).

On May 6, 2004, plaintiff was evaluated by Dr. Michael Pittman of Urologic Surgery Associates pursuant to a referral from Dr. Braly. Plaintiff related onset of urinary frequency two weeks earlier and severe pain upon catheter insertion at the time of the radiation treatments. The impression was suspected radiation cystitis. Plaintiff was given some samples of Detrol LA and a cystosocpe was to be scheduled. (Tr. pp. 132-133). The latter procedure was performed by Dr. Pittman at the Fairway Medical Center on May 11, 2004. Findings from that testing were chronic inflammatory changes of the vesicourethral juncture including frond formation and minimal chronic inflammatory changes of the distal trigone. The postoperative diagnosis was moderate cystocele and urethritis. (Tr. pp. 134-135). Following that procedure, plaintiff's symptoms of abdominal discomfort and urinary frequency declined and she resumed radiation therapy, receiving a total of five treatments which were completed in May of 2004. (Tr. p. 138). By the time plaintiff returned to Dr. Levine on June 24, 2004, all of her symptoms had subsided completely and she had no complaints. Plaintiff was described as doing well and recurrence-free and was to be reevaluated by Dr. Levine in four months. (Tr. pp. 138-139).

Plaintiff underwent Pap and HPV testing on July 6, 2004. The former was negative for intraepithelial lesion and malignancy but

17

some cellular changes associated with atrophy and inflammation were present. The latter test was positive for one or more viral types in a particular HPV group but was not specific as to which one. (Tr. pp. 209-210). Chest x-rays were taken on July 7, 2004 and were compared with those from February 6, 2004. The plain view of the chest was unremarkable and what was previously described as a questionable left lower lobe nodule was determined to be nipple shadow. (Tr. p. 143). Plaintiff was next seen at MFMC on July 13, 2004 for complaints of right arm pain and sinusitis. The assessment was lateral epicondylitis. Plaintiff was given an injection to the affected area, was prescribed medication, and was directed to use ice and a brace for relief. (Tr. p. 81).

When plaintiff returned to Dr. Braly for a follow-up visit on August 20, 2004, she complained of severe fatigue and reported being unable to work. Her lower back pain was worse with radiation into the left lower extremity and bilateral groin pain was also present. No treatment was set forth on the clinic note. (Tr. p. 205). At the direction of Dr. Braly, a CT scan of the chest was performed on August 26, 2004 which was normal. (Tr. p. 204). A CT scan of the pelvis, with and without contrast, was performed on August 28, 2004. That testing revealed the presence of a single borderline lymph node adjacent to the right pelvic sidewall and further study was indicated. (Tr. p. 203). Two days later, plaintiff underwent

another CT scan of the abdomen, with and without contrast, which was then compared with the study that had previously been done on April 28, 2004. Results of the test demonstrated small, soft tissue nodules in the mesentery and retroperitoneum consistent with being lymph nodes which did not meet the size criteria for metastatic lymphadenopathy but were worrisome for metastatic disease as they were new or larger as compared with the previous study. Cysts were also noted in the liver and right kidney. (Tr. pp. 177-178).

On September 8, 2004, plaintiff was seen by Dr. Sanjay Raina, an internist, for complaints of abdominal pain, sinus congestion, and chest congestion. The diagnosis included constipation and abdominal pain; medications were prescribed. (Tr. pp. 233-234). Plaintiff arrived at the SMH Emergency Room, via wheelchair, on September 19, 2004 in connection with a migraine headache that had started earlier in the day. Stress and exhaustion were thought to be the precipitating factors as plaintiff had been fasting in preparation for a colonoscopy the following day. Plaintiff was treated with fluids and IV-administered Demerol and was transferred to the Outpatient Clinic in improved condition. (Tr. pp. 146-152). A colonoscopy was then performed during which several polyps were removed endoscopically but the results of the test were otherwise normal. (Tr. pp. 153-159).

Plaintiff returned to Dr. Raina on September 24, 2004 and

reported feeling worse with continued abdominal pain and swelling, back pain, and night sweats. (Tr. p. 232). On October 5, 2004, plaintiff was evaluated by Dr. Allen Calabresi. She was still experiencing night seats with abdominal cramping and subjective fever with some mild weight loss. Migraine headaches were increasing in frequency and intensity. Based on the results of his examination and a review of the various physicians' records, Dr. Calabresi opined that plaintiff had a new onset of mesenteric and retroperitoneal lymph node adenopathy. The doctor recommended a repeat PET-CT fusion scan and other tests and a possible surgical consultation pending the scan results. A head CT scan was also scheduled in light of the increase in plaintiff's migraine headaches. (Tr. pp. 166-173).

The ordered CT scan of plaintiff's head/brain went forward on October 8, 2004 and revealed no significant abnormalities. (Tr. p. 176). A second whole body PET/CT scan performed on October 11, 2004 revealed no evidence of metastatic disease but there was physiologic uptake within the myocardium, GI tract, and urinary system. (Tr. pp. 174-175). Plaintiff was next seen by Dr. Calabresi at SMH on October 21, 2004 but his treatment note is not particularly legible except for a referral to surgery. (Tr. pp. 161-162). On October 22, 2004, plaintiff returned to Dr. Braly for follow-up evaluation. Plaintiff complained of severe fatigue and night sweats and was no longer able

to work.  In addition, she was now experiencing pain in her arm, leg, and groin, abdominal discomfort, and pencil-thin stools. Further testing was ordered. (Tr. pp. 195-198).

On October 24, 2004, plaintiff was seen by Dr. Agustin Suarez of Hematology and Oncology Specialists, L.L.C.  Dr. Suarez recalled plaintiff's surgery in February of 2004 and subsequent radiation treatments which ended in May of that year.  Plaintiff had then returned to work but by August of 2004 was no longer able to continue due to general malaise in the form of night sweats, low-grade fever, recurrent nosebleeds, hives, and back pain at night. Except for these problems in 2004, Dr. Suarez noted that plaintiff's past medical history was "quite insignificant" except for migraine headaches and she was not taking any medications on a chronic basis. Based on his examination of plaintiff and a review of the medical records, the doctor was not convinced that plaintiff was experiencing a recurrence of her cancer or the onset of some new malignant process but he did suggest repeat CT scans one month and six months in the future to totally rule that out.  Estrogen deprivation was also considered as a possibility. (Tr. pp. 229-230). The results of a Pap smear reported on November 5, 2004 demonstrated atypical squamous cells of undetermined significance. (Tr. p. 194).

On November 22, 2004, plaintiff completed the Administration's "Function Report-Adult", setting forth therein information on her

daily activities.    Plaintiff was able to tend to her own personal needs and to do light household chores except when she was unable to do so due to fever, aches, pains, and weakness. However, all daily tasks took longer to complete and required rest periods in between and when the pain was too great the tasks were simply put off.  Plaintiff was able to drive a car and go grocery shopping with her husband every other week but she sometimes had to use the store's wheelchair.    Hobbies were identified as needle work, crochet, and embroidery but those could not be done for very long secondary to pain.  At best, plaintiff estimated that she could only walk fifteen to twenty feet but then required rest periods that ranged from a few minutes to hours or even days.  (Tr. pp. 51-58).

On December 1, 2004, Dr. Raina issued a report summarizing plaintiff's medical history, noting that she had abdominal borderline lymphadenopathy of unknown significance, migraine headaches on a chronic basis, fever and fatigue of uncertain significance, and non-specific abdominal pain.    In terms of plaintiff's ability to perform work-related activities, Dr. Raina observed that "... she can sit, stand, walk, lift, and carry probably no more than 10 pounds.  She can handle objects.  She can hear, speak, and travel." However, "[a]ll of the above activities might be affected by her diagnosis of malignancy and the symptoms that she is experiencing."    Dr. Raina also noted that the "...

above-mentioned conditions might effect her sustained concentration, persistence, social interaction and adaptation." (Tr. p. 231).

On December 3, 2004, an Administration medical consultant reviewed the medical records then extant and completed a "Physical Residual Functional Capacity Assessment" form designed to elicit opinions on plaintiff's capabilities. There, the consultant checked off boxes on the form indicating that plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds but could frequently perform the other listed postural maneuvers; had no manipulative, visual, or communicative limitations; and, who was to avoid workplace hazards but otherwise had no environmental limitations. Essentially, the consultant found that plaintiff was capable of performing light-level work and that she was able to return to her past work as a court reporter as that job is generally performed in the national economy. (Tr. pp. 235-243).

The next medical records were not generated until August 24, 2005 when plaintiff was seen at Women's Surgical Specialists in Slidell. The treatment note from that date indicates that a nurse practitioner affiliated with Dr. Braly had found a possible fistula and placed plaintiff on Augmentin. Plaintiff reported recent back

pain but none that day. Testing was ordered. In connection with her evaluation that day, plaintiff completed a questionnaire in which she indicated that she rarely had burning or pain during urination, rarely had a strong urge or need to urinate, rarely had a strong urge to urinate and actually leaked urine before she reached the toilet, and rarely leaked urine when she coughed, sneezed, exercised, or strained. However, she often felt that her bladder had not emptied when she finished urinating. (Tr. pp. 266-268). On September 5, 2005, plaintiff presented herself at M.D. Anderson Cancer Center and complained of progressive shortness of breath upon exertion for the previous three weeks, a dry cough, back pain that was worse upon lying down, and hives. A chest x-ray was normal and other studies were conducted. The assessment was acute bronchitis and plaintiff was given Lortab and Phenergan and was given a prescription for Augmentin. (Tr. pp. 249-262).

On September 28, 2005, plaintiff underwent Doppler echocardiographic studies at SMH following an apparent admission which revealed mild concentric left ventricular hypertrophy with preserved function and pulmonary artery systolic pressure at the upper limits of normal. (Tr. p. 364). In a consultation note authored by Dr. David Hebert on that same date, he recalled that plaintiff had been scheduled to undergo a vesicovaginal fistula test which was delayed by the arrival of Hurricane Katrina. Plaintiff

was now suffering from a pulmonary embolism which made her a poor candidate for surgical repair but thus elevated the importance of conducting the fistula test and making a firm diagnosis to rule out a recurrence of her carcinoma. Plaintiff reported minimal leakage or discharge at this time. (Tr. p. 269). On September 30, 2005, plaintiff was evaluated by Dr. Victor Echenique at SMH who noted that plaintiff had been complaining of shortness of breath for two months and that an outpatient CT scan of the chest had revealed multiple pulmonary emboli. Plaintiff's past medical history was said to be endometrial adenocarcinoma, a fistula, and chronic obstructive pulmonary disease ("COPD"). Complaints at this time included nasal congestion, shortness of breath and dyspnea on exertion, and recurrent urinary tract infections. Dr. Echenique's impression was: 1) pulmonary embolus, 2) COPD, 3) persistent smoking, 4) endometrial adenocarcinoma, 5) a bladder fistula and 6) sinusitis. The plan was to schedule an echocardiogram and an ultrasound of the lower extremities to determine the presence, if any, of deep vein thrombosis. (Tr. pp. 365-366).

While she was still admitted to SMH, plaintiff underwent a cystocopy with retrograde fistula dye test at the hands of Dr. Hebert on October 3, 2005. Both the pre-operative and post-operative diagnoses were to rule out a vesical fistula. (Tr. p. 270). An x-ray taken at the time did not demonstrate any abnormal

contrast within the bowels. (Tr. p. 271). Plaintiff was discharged from SMH on October 3, 2005 but was directed to return for Lovenox infusions and further testing on the following days. (Tr. pp. 275-276). Plaintiff returned to SMH as directed on October 4 and 5, 2005. (Tr. pp. 273-279). On the evening of October 5, 2005, plaintiff presented at the SMH Emergency Room for complaints of sharp chest pain that ran through to the back and shortness of breath. Plaintiff was administered Demerol and Phenergan and it was noted that she was also taking Lovenox and Coumadin at the time. Routine tests were run and within several hours plaintiff's condition had stabilized and she was discharged with instructions to continue with her medications and to follow-up with Dr. Suarez in two days. (Tr. pp. 280-292).

Plaintiff returned to the SMH Outpatient Clinic on October 17, 2005 for an MRI of the head in connection with "new tremors" but no test results appear in the record. (Tr. pp. 293-295). An ultrasound of the lower extremities was subsequently performed at SMH on November 4, 2005 which was negative for the presence of thrombus. (Tr. pp. 296-299). Plaintiff was next seen at the SMH Emergency Room on November 22, 2005 for complaints of upper right back pain from the previous day and chest pain. Once again, plaintiff was treated with Demerol and Phenergan and was administered a battery of routine tests. The diagnosis was right rib pain. Plaintiff was

discharged home with instructions to apply warm compresses to the affected area, to take Tylenol every six hours for pain, and to follow-up with Dr. Suarez that week. (Tr. pp. 302-313).

On June 26, 2006, plaintiff was seen by Dr. Marielisa Sedrish of Gulf Coast Rheumatology Associates for complaints of generalized joint pain of the previous six to ten months, particularly to the ankles, knees, and elbows. A few hours of morning stiffness was also not uncommon. Other noted symptoms included fatigue, dry eyes, a cough, and some shortness of breath. For pain relief, plaintiff was taking Lortab and Motrin. X-rays were ordered and plaintiff was prescribed Dolobid. (Tr. pp. 323-325). Bloodwork was also done at this time. (Tr. pp. 332-335). On July 10, 2006, plaintiff advised Dr. Sedrish that she had not started on Dolobid as it was too expensive. Joint pain was reported to the hands, feet, knees, and elbows. In addition to Lortab and Motrin, plaintiff was also taking antibiotics for cystitis. Osteoarthritis was suspected. A bone scan was ordered and Sulindac was prescribed. (Tr. pp. 321-322). As ordered by Dr. Sedrish, x-ray studies were also done on July 10, 2006. Those of the hands revealed osteoarthritis predominantly involving the distal interphalangeal joints of the index and middle fingers. X-rays of the left foot were negative but those of the right foot showed mild osteoarthritis involving the first metatarsophalangeal joint. (Tr. pp. 329-331).

Plaintiff underwent a whole body bone scan at SMH on October 2, 2006.  The impression was mild increased uptake in the major joints, possibly due to rheumatoid arthritis, but no other significant findings. (Tr. p. 327).  Chest x-rays done on that date were negative for acute pulmonary process or significant changes as compared with those that were supposedly taken on November 22, 2005. (Tr. p. 328).  Plaintiff was next seen by Dr. Sedrish on October 9, 2006 at which time she was still suffering from joint pain to the hands, feet, knees, and elbows and stiffness for several hours in the morning.  The Sulindac that was previously prescribed was taken only occasionally.  Plaquenil and Prednisone were prescribed. (Tr. pp. 319-320).  Plaintiff had an eye examination on October 30, 2006 for complaints of two to three months of excessive tearing and intermittent pain that sometimes wakened her at night.  She was directed to start on a course of Plaquenil. (Tr. p. 343).

The final treatment notes dated November 6, 2006 document plaintiff's evaluation by Dr. Sedrish.  Plaintiff had not started taking Plaquenil yet but she did feel like the Prednisone was helping with her pain and swelling.  However, plaintiff still suffered from a frequent flu-like feeling.  Another prescription for Plaquenil was written and plaintiff was to return to Dr. Sedrish in one month. (Tr. pp. 317-318).  Routine blood work was also done at this time. (Tr. p. 326).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on two grounds. First, she alleges that the ALJ's residual functional capacity ("RFC") assessment was flawed in that it failed to recognize significant residual effects and symptoms from her uterine cancer and subsequent radiation treatment. Second, plaintiff alleges that substantial evidence does not support the ALJ's conclusion that she can return to her past relevant work. In making this challenge, plaintiff points to the testimony of the VE to the effect that she would be unable to work, either as a court reporter or any other occupation, if she required hourly breaks of ten to fifteen minutes throughout the day.

The Court is not unmindful of the fact that the assessment of an individual's RFC is entrusted to the ALJ in the first instance. 20 C.F.R. §§404.1546(c), 416.946(c). The Court is also aware that the evaluation of a claimant's testimony and subjective complaints is a task which is within the province of the ALJ. Harrell, 862 F.2d at 480; Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987). Nevertheless, the ALJ must sufficiently articulate his reasons for discrediting a plaintiff's subjective complaints of pain and other limitations. Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)). For the reasons that follow, the Court believes that this case

should be remanded to the Commissioner for further consideration.

At the time of the administrative hearing that was held on December 22, 2006, the ALJ had before him the medical records described above which document plaintiff's numerous complaints to various doctors of urinary frequency and fatigue as well as chronic migraine headaches. Upon taking the stand, plaintiff testified to increasing headaches and continued urinary frequency including weekly episodes of incontinence. For reasons known only to him, the ALJ then posed a hypothetical question to the VE which assumed, inter alia, the need for hourly breaks of ten to fifteen minutes, an ability to remember and carry out only simple to moderately detailed instructions, and an inability to interact with the public more than occasionally secondary to pain and fatigue, essentially the very limitations that plaintiff had testified to.  In answer to that hypothetical question, the VE testified that the described individual would be unable to perform plaintiff's past work as a court reporter due to the skill level and break requirements.  The VE testified further that there was no other work available that the described individual could perform. When the VE was tendered to plaintiff's counsel for questioning, she understandably had no modifications or additions to make to the hypothetical question as initially framed by the ALJ.  To the original hypothet, the ALJ then added even more limitations and the VE's answer thereto was

predictably the same.

In his subsequent written decision of February 21, 2007, the ALJ provides no meaningful explanation of why he failed to credit the very limitations that he himself included in his hypothetical question to the VE. Plaintiff's hearing testimony is not discussed by the ALJ at all. Indeed, the only reference that was made of the hearing testimony was a fleeting reference on the final page of the ALJ's decision that the VE classified plaintiff's past work as sedentary. (Tr. p. 20).

Incontinence constitutes an impairment under the Social Security Act that must be considered in determining whether a claimant is disabled. <u>Crowley v. Apfel</u>, 197 F.3d 194, 198-199 & n.17 (5th Cir. 1999). The ALJ in the present case included limitations in his hypothetical question which were viewed by the VE to be favorable to plaintiff's cause yet the ALJ offered no specific explanation in his written opinion of why he apparently chose to discredit those limitations. The Court is thus unable to say with sufficient certainty that the Commissioner's decision is supported by substantial evidence.

Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for further consideration of plaintiff's applications at the fourth step of the sequential analysis and, if appropriate, at the fifth step. In connection

31

therewith, the record should be further developed, through consultative examination with a urologist and/or other qualified health care professional pursuant to 20 C.F.R. §404.1517, <u>et</u>. <u>seq</u>., to determine the extent of plaintiff's stated incontinence and how it impacts her ability to engage in gainful employment.

<b><u>RECOMMENDATION</u></b>

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further consideration of plaintiff's applications at the fourth step of the sequential analysis and, if appropriate, at the fifth step and for supplementation of the record as noted hereinabove.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __11th__ day of _____March_____,
2009.

_____
UNITED STATES MAGISTRATE JUDGE